INDUSTRIA LECHERA DE PUERTO RICO, Plaintiff and Appellant,
v. SECRETARY OF THE TREASURY OF THE COMMONWEALTH
OF PUERTO RICO, Defendant and Appellee.

No. R-66-348.      Decided March 27, 1968.

A. De Jesús Matos and R. De Jesús Cintrón for appellant. J. B. Fernández Badillo, Solicitor General, and Adaljisa Díaz Collazo, Assistant Solicitor General, for appellee.

Second Division composed of Mr. Justice Hernández Matos, as Chief Judge of Division, Mr. Justice Santana Becerra, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

We issued a writ of review to revise the decision denying a refund of the property taxes paid by appellant, Industria Lechera de Puerto Rico, Inc. The case was submitted on the allegations which are very succinct.

The trial court concluded as a matter of fact that on January 9, 1962, the Secretary of the Treasury assessed and levied taxes on the property of the corporation Industria Lechera de Puerto Rico for the fiscal year 1962–63; that Act No. 72, which took effect June 22, 1962, provided a property tax exemption for personal property, land, buildings, equipment, accessories, and vehicles of Industria Lechera de Puerto Rico; and that appellant paid the property tax, which amounted to $10,709.90, and appealed to the court for a refund of the tax.

The trial court concluded at law that the question in litigation was whether or not Industria Lechera de Puerto Rico was exempt from the payment of property taxes for the fiscal year 1962–63. The court—citing *García Commercial, Inc.* v. *Secretary of the Treasury*, 80 P.R.R. 739 (1958); *Destilería Serrallés* v. *Tax Court*, 70 P.R.R. 65 (1949); *Buscaglia, Treas.* v. *Tax Court*, 68 P.R.R. 34 (1948); *Buscaglia, Treas.* v. *Tax Court*, 63 P.R.R. 37 (1944); *Roig* v. *Treasurer*, 54 P.R.R. 617 (1939), and *Teachers' Assn. Etc.* v. *Treasurer*, 54 P.R.R. 511 (1939)—stated, for the above purpose, that

the taxable status of property arises on January 1 of each year; that the taxable status of the property here involved, in order to determine whether or not the property was subject to the payment of property taxes for the fiscal year 1962–63, arose on January 1, 1962; and that Act No. 72 of June 21, 1962, contains no retroactive date or clause and there is nothing in the law to indicate a legislative intent to make the law retroactively effective. Based on these conclusions the complaint was dismissed.

■ The foregoing findings of the trial court in the sense that the taxable status of any property for the assessment and payment of taxes arises on January 1 of each year for the fiscal year beginning July 1 of that year and ending June 30 of the following year are correct. According to § 298 of the Political Code, real property is assessed, for tax purposes, to the person who is either the owner or in possession of the property on the first day of January, or to the person in whose name the property is recorded in the Registry of Property on the date of assessment, unless the Secretary of the Treasury learns that that person is not the actual owner of the property.

Similarly, it is correct to say that the tax liability is determined according to the taxable status of the property as of January 1, but, according to law, the obligation to pay the tax begins on the following July 1.—Political Code, § 330.

■ It is correct also, in the light of our decisions, that changes in the title holder of the property, or changes in the property itself, taking place between January 1 and July 1 do not alter or affect, ordinarily, liability for the tax.

■ The above statements are general principles of unquestionable enforcement. However, each suit involving these principles must be considered and decided in the light of the particular facts and circumstances and since tax exemptions are liberal acts of the lawmaker because, as has been stated,

they have the effect of appropriations of public funds for the benefit of the favored person or entity, the courts must always comply with the legislative intent and not acknowledge more than what the lawmaker intended to grant, although we should not defeat that intent, either, by acknowledging less, or denying what the lawmaker wanted to grant. The statement, so often repeated, that tax exemptions must be restrictively construed, shall not be taken, in every case, as an axiomatic principle without considering the intent of the lawmaker.[1]

*Buscaglia, Treas.* v. *Tax Court,* 68 P.R.R. 34 (1948), cited by the appellee as of special application, involved Act No. 61 of May 5, 1945. This Act was a statute of general nature defining and exempting raw materials from taxes. Section 3 of the Act provided that "raw material" that could be guaranteed to be destined for the production of finished articles would be exempt from the payment of property taxes while it remained in possession of its producer, of the importer into Puerto Rico, of the producer of the finished article, or of any intermediate distributor who had it for sale or delivery to a producer of finished articles in the manufacture of which this raw material entered. This Act became effective July 1, 1945. The taxpayer therein claimed, for the fiscal year 1945–46, a tax exemption for the raw material that could have been in its possession on January 1, 1945. We decided that Act No. 61, approved on the following May of that year, was not retroactively effective and, therefore, did not change the tax liability already attributed to the taxpayer.

It should be noted that § 3 of this Act was drawn up similar to § 291 of the Political Code which provides, in general, what property is exempt from taxation. The Act provided that certain raw material, as therein defined, would

---

[1] *Cf. Textile Dye Works, Inc.* v. *Secretary of the Treasury,* 95 P.R.R. 692 (1968).

be, when determining their taxable status, exempt from taxation upon the fulfillment of the requirements therein stated.

*National Hats Co.* v. *Sancho, Treas.*, 65 P.R.R. 226 (1945), is emphatically cited in *Buscaglia, supra*. It involved a taxpayer to whom the Public Service Commission had granted a tax exemption for a period from March 2, 1932, to January 31, 1935. The Commission acted by virtue of its powers over new industries granted by Act No. 40 of April 25, 1930, a general law on the subject. The exemption expired on January 31, 1935, and the taxpayer requested an extension thereof on the following February 4. On May 4, 1936, the Commission granted the taxpayer a new 5-year exemption period effective retroactively to February 1, 1935. We held that, although the Legislature was empowered to delegate the granting of a tax exemption in an administrative organization, it did not, at any time, authorize the Commission to make the granting of the exemption retroactively effective. Since the exemption granted on May 4, 1936, could be of prospective effect only, the taxpayer was bound to pay the tax for the fiscal year 1936–37 imposed on January 15, 1936, date on which, without the retroactive effect we annulled, there was no tax exemption.

The decision in *Teachers' Association* v. *Treasurer, supra*, invariably mentioned in controversies of this nature, was based on the general provision of § 291 of the Political Code specifying property exempt from taxation. In 1931 a lot of land was sold by the People of Puerto Rico to the Teachers' Association under the condition that a building would be constructed on the site within five years. The building called the "Teacher's Temple" was inaugurated during the month of April 1935. The lot had been assessed on January 15, 1935, for the fiscal year 1935–36. Under the provisions of subsection (e) of § 291 to the effect that, every building used as a center for literary or scientific education, or as a recreational center . . . and every tract of land, not exceeding five

cuerdas, upon which such building or buildings is or are constructed, shall be exempt from taxation, the position of the Association was that since the building was completed in April 1935, the tract of land upon which the building was constructed enjoyed tax exemption as of July 1, 1935. Based on the general principles mentioned above we held that the change in the property did not alter the Association's tax liability which arose on January 15, 1935. This case is important because it states the reasons for the above rules as follows (page 515):

"The necessity of having a date, prior to the actual moment of collection, whereupon the state can definitely estimate its taxable source for the coming fiscal year is obvious. It takes time to prepare the assessment list of the property, the taxroll and the tax receipts. The taxable status of property should be unaltered after a certain time and prior to the date of the payment of the tax as the Treasurer must have a fixed basis upon which to float loans, increase or reduce taxes, etc.

"This, we deem, is the fundamental reason for the rule. Furthermore, collection would be rendered uncertain and impractical if the state had to allow for exemptions, trace sales to new vendees or apportion taxes between subsequent owners during the same year."

It may be noted that the reason for the existence of this rule, established judicially, is one of practical convenience.

Roig v. Treasurer, supra, involved the sale by the taxpayer of a tract of land to the Municipality of Humacao on May 25, 1935. When the taxpayer was billed for the 1935–36 taxes on the tract of land, he resisted making payment on the ground that the tax was a lien on the property and that the owner of the land as of July 1, 1935, was the Municipality of Humacao. Under the general rule stated above, we rejected this contention.

The above cases, and others that we need not mention, involved tax exemptions under general legal provisions such as the laws specifically mentioned and § 291 of the Political

Code. This also is the situation in the more recent case, *Valdés Cobián* v. *Secretary of the Treasury*, 93 P.R.R. 804 (1966). Act No. 60 of June 20, 1958, another general law, was involved in this case. Section 3 of that Act provided that lots affected by the official map adopted by the Planning Board pursuant to §§ 11 and 19 of Act No. 213 of 1942, that were unoccupied or unused, and not yielding revenue were exempted from all property tax for so long as they remained in such condition and during the subsistence of the impediment to construct, which was the ground for the exemption. Likewise, built-on lots that were unoccupied or unused and not yielding revenues were also exempted as long as they remained in such condition and during the subsistence of the impediment to construct. On January 1, 1960, a tax for the fiscal year 1960–61 was imposed on certain property of the taxpayer. The taxpayer, after paying the tax for that fiscal year, filed for a refund of the taxes, contending that the property had been affected since June 2, 1960, by a public improvement project according to Act No. 60 above. The claim for refund was denied on the ground that as of January 1, 1960, the property was not affected by the project. We upheld the Secretary of the Treasury, based on the general rules of law above mentioned.

The above cases are good examples of the rule followed for the practical and useful reasons stated in *Teachers' Association, supra*, of not altering tax liabilities arising formerly on January 15 and subsequently on January 1 according to changes in ownership of the property, changes in the property itself or in its use, or for any other reasons. We repeat that these were exemptions under laws of general application. Let us now turn to the case at bar.

On June 21, 1962, the Legislature approved Act No. 72, to which immediate effect was given. According to its title, the only purpose of the Act was to exempt Industria Lechera de Puerto Rico, Inc., appellant herein, from *the payment* of

property and income taxes. Section 1 of the Act exempted from the payment of property taxes all property owned or which in the future might be acquired by Industria Lechera de Puerto Rico, Inc., for the development of its ends and purposes. Section 2 exempted from the payment of all kinds of taxes all income of the Industria Lechera. Section 3 exempted from the payment of excises, duties, and any other type of importation or purchase impost, the equipment, machinery, vehicles, and accessories acquired or imported by Industria Lechera de Puerto Rico, Inc., for use in the operation of its business. All these exemptions would be in full force and effect as long as the totality of the capital stock of the corporation, appellant herein, belonged to the Milk Industry Development Fund created by Act No. 34, of June 11, 1957.

The provisions of this Act are preceded by a Statement of Motives offering clearly the reasons for the exemptions.[2]

---

[2] "During recent years the milk industry of the Island has grown in such a manner that it has become the most important phase of agriculture in Puerto Rico.

"Such development has been due, in part, to the regulation established by Act No. 34, of June 11, 1957, which provides a price guarantee both at the producer's level and at the processors'.

"On the other hand, the Puerto Rico Milk Industry, Inc., a corporation started on private capital, whose shares belong at present to the Milk Industry Development Fund, has greatly contributed to the development of industry in general, inasmuch as through it the Regulation Office has been able effectively to channelize the industry's seasonal surpluses, which in this manner have been utilized and their price held at a level where the milk producer is not economically harmed.

"At present the Puerto Rico Milk Industry Corporation, Inc., is an extremely effective instrument in the utilization of the seasonal milk surpluses that were formerly emptied in brooks, as, through the use it makes of such surpluses, the latter are no longer spilled and wasted, but turned into useful products, such as cheese, butter, ice cream mix, etc., which contribute to improve the country's general economy, inasmuch as their processing provides employment for different persons, makes money stay in Puerto Rico which would otherwise be exported for purchasing those very products abroad, and maintains a constant demand for surplus milk at a reasonable price to the advantage of producers and processors.

"Inasmuch as the milk industry of Puerto Rico is still susceptible

The report of the Committee of Agriculture of the House of Representatives on H.B. 504, which became Act No. 72, stated (15-4 Journal of Proceedings 1712) :

"In connection with this measure, the Committee heard Mr. Plácido Acevedo, Administrator of the Milk Industry Regulation Office, and Mr. Manuel Juarbe, Assistant Secretary in charge of public revenue of the Department of the Treasury, both speaking in favor of the act.

"Through this bill Industria Lechera de Puerto Rico, Inc., is exempt from the payment of property and income taxes as long as all of the capital stock of the corporation belongs to the Milk Industry Development Fund created by Act No. 34 of June 11, 1957, as amended.

"Industria Lechera de Puerto Rico, Inc., was created to help the stabilization of the dairy industry by using milk surplus in the manufacture of products such as cheese, butter, etc. This corporation was established by contributions of producers and manufacturers of fresh milk. The stock of the corporation was purchased by the Milk Industry Development Fund in 1959.

"The tax exemption granted to this enterprise expires in 1961–62. The best and uninterrupted operation of this plant is indispensable for the development of the Puerto Rican milk industry."

On June 21, 1962, when Act No. 72 governing this case took effect, the stock of appellant was in the hands of the Fund created by Act No. 34 of June 11, 1957. This fact does not appear from the record, which is very concise, but is stated in the reproduced report. See 29 Opinions of the Secretary of Justice 78, where an opinion of the Secretary of Agriculture of May 12, 1958, sustaining the power of

---

of further growth, and the most effective way of promoting and extending such growth is by maintaining an expansive market for the milk produced, such as will in turn require and economically support an industry continually producing surpluses, the maintenance and operation of a plant for the processing of milk by-products capable of processing the surpluses produced, whatever the quantity, is of paramount importance.

"Judging that the operations of the Puerto Rico Milk Industry, Inc., constitute an indispensable corollary to the growth and expansion of the island's milk industry, this bill is introduced."

the Fund created by Act No. 34 of 1957 to invest $100,000 in the acquisition of stock of the private corporation Industria Lechera de Puerto Rico, Inc., is published.

. . The problems in Puerto Rico of producing milk and of the milk industry have constituted a great preoccupation for the Legislature. Act No. 106 of June 28, 1956, created the Office of the Milk Industry Regulation Administrator and also its Advisory Board, composed of five persons to advise him, three of them representatives of the public interest, a representative of the producers and a representative of the milk pasteurizing and milk products processing industry. The Legislature believed that this phase of the Puerto Rican economy should be taken care of and regulated because of the problems involved. A year later Act No. 34 of June 11, 1957, replaced Act No. 106 and created, in addition to the regulation, a Milk Industry Development Fund.

The Declaration of Purposes appearing in Act No. 34 speaks of a chaotic situation in the milk industry in Puerto Rico and the conflicting interests among processors themselves and between processors and producers; of the threat that the continuance of this situation would result in the collapse of this important industry; the impossibility for a milk surplus factory to operate because of these conflicts; the potential destruction of the product and the wasting of surpluses; marketing problems; and the need for the Legislature to intervene directly in the industry through the exercise of its police power so as to promote the general welfare.

It was conclusive for the trial court, as the appellee points out, that a retroactivity clause was missing in Act No. 72 of 1962. In the light of the said general rules this fact is important. In the light of the special situation governing this case the lack of such a clause is not fatally destructive of appellant's right. Also, there is an explanation:

According to the criteria of the Legislature as stated by the Committee of Agriculture of the House of Representa-

tives, the tax exemption enjoyed by appellant was to expire in 1961–62. If so, the property was not taxable as of January 1, 1962. A retroactivity clause in the statute approved on June 21, 1962, which took immediate effect, would have been unnecessary and superfluous. There is no evidence in the record, although there are expressions in the briefs, to the effect that the exemption expired in 1960–61. Even if the latter is correct it does not alter the fact that the Legislature acted, with regard to the need of a retroactivity clause, in the belief that the exemption expired one year later.

The situation in the case at bar is somewhat similar to that in *Destilería Serrallés* v. *Tax Court*, 70 P.R.R. 65 (1949), decided subsequent to *Buscaglia, Treas.* v. *Tax Court*, 68 P.R.R. 34, *supra*. Act No. 53 of 1945, effective May 5, 1945, exempted from the payment of property taxes those products stored for aging in order to improve their quality. The exemption covered all the fiscal years following the first year in which they were stored for aging. The products that were so stored, prior to the effective date of the Act, for not less than one year, and on which the taxes for that year had been paid, were also exempt during subsequent years. On January 15, 1945, the taxpayer therein had in storage for aging great quantities of rum and had paid the tax for 1944–45.

Reversing the judgment of the trial court denying the exemption to Destilería Serrallés for 1945–46, we stated (page 67):

"We agree with the Treasurer that the obligation to pay the property tax for 1945–46 arose on January 15, 1945. *Buscaglia* v. *Tax Court*, 68 P.R.R. 34, and cases cited therein. But before the petitioner was required by law to pay the tax, the Legislature passed Act No. 53. This statute provides for forgiveness of the 1945–46 tax for any products which like this rum come within its terms."

■ The case at bar deals with an exemption even more particular because Act No. 72 was approved only for the benefit of appellant and is not applicable to any other taxpayer. This exemption was not limited to property taxes, in which case the special mechanism of the first of January would apply, with the practical and useful administrative reasons we stated in *Teachers' Association, supra,* but it also included income taxes and any other type of excise, duty or impost. The only requirement was that all the capital stock of appellant belong to the Fund created by Act No. 34 of 1957. The report of the Committee of Agriculture above-copied states that the stock was acquired by the Fund in 1959. There is no indication in the record that on June 21, 1962, the date of enforcement of Act No. 72 of that year, the Fund was no longer in possession of the stock.

Finally, even if we admitted, in opposition to the Report of the Legislature, that the exemption enjoyed by appellant did not cover the year 1961–62 and was terminated in 1960–61, the order of the Legislature appearing in Act No. 72 providing that this appellant *shall not pay* any tax, excise, duty or impost, prior to appellant's obligation to make such payment on July 1, 1962, is sufficiently clear as to be judicially defeated by using the rules of general convenience established in unrelated circumstances.

The judgment denying the appellant the refund of the litigated tax will be reversed and another rendered granting the refund.